RECEIPT NUMBER

37625

ORIGINAL

107 pgs

attach a-E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN SCHRAMM, ROBERT PETERSEN,
JAMES TOLONEN, CATHERINE STEWARD,
DAVID BOSMAN, AND CHARLES KOVSKY,

        Plaintiffs,

v.

COMPUTER METHODS CORPORATION, a
Michigan corporation, SILVERCUBE HOLDINGS, LLC,
a Michigan limited liability company, GREGORY
GUIDICE, XEVER, LLC, a Michigan limited liability
Company, and PETER GRUITS,

        Defendants.

_____/

JUDGE : Borman, Paul D.
DECK  : S. Division Civil Deck
DATE  : 01/27/2005 @ 13:30:08
CASE NUMBER : 2:05CV70308
REM JOHN SCHRAMM V. COMPUTER
METHODS (KC)

MAGISTRATE JUDGE PEPE

## FILED

JAN 2 7 2005

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

***Related Chapter 11 Bankruptcy Case:***

In the Matter of:

COMPUTER METHODS CORPORATION,

        Debtor,

Tax I.D. No. 38-2159731

_____/

Case No. 05-41998
Chapter 11
Hon. Marci McIvor
United States Bankruptcy Court
Eastern District of Michigan
Southern Division

## NOTICE OF REMOVAL UNDER FED. R. BANKR. P. 9027 AND 28 U.S.C. § 1452(a)

Computer Methods Corporation ("Debtor"), states:

1. Debtor filed a Voluntary Petition under Chapter 11 of the United States Bankruptcy Court (the "Code") on January 24, 2005 (the "Petition Date"). The Voluntary Petition was filed in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, Case No. 05-41998. A copy of the Voluntary Petition is attached as Exhibit A.

2.  Prior to the Petition Date, on December 7, 2004, John Schramm, Robert Petersen, James Tolonen, Catherine Stewart, David Bosman, and Charles Kovsky ("Plaintiffs") filed a Complaint in the Wayne County Circuit Court of the State of Michigan, Case No. 04-437292-CB (the "Action"), against the Debtor, Silvercube Holdings, LLC ("Silvercube"), Gregory Guidice, the Debtor's Chief Executive Officer, Xever, LLC ("Xever") and Peter Gruits.

3.  Among other things, the Complaint alleges that the Plaintiffs are shareholders in the Debtor; that Defendant Silvercube owns 80% of the shares of the Debtor; and that Mr. Guidice owns 100% of the membership interest in Silvercube and is therefore able to control the Debtor; that Debtor, Silvercube, and Mr. Guidice contemplated a sale of Debtor's assets to Xever (with whom Mr. Gruits is associated); that the Debtor and the other Defendants should be enjoined from entering into any such transaction; and that a receiver should be appointed to oversee the Debtor's operations as well as to conduct a sale of the Debtor's business.  The pleadings are attached.

4.  Pursuant to Fed. R. Bankr. P. 9027 and 28 U.S.C. §1452(a), Debtor may remove this Action to this Court, and under said rule this Notice of Removal is timely.

5.  The United States District Court for the Eastern District of Michigan has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) because the Action is related to Debtor's Chapter 11 bankruptcy case.  This matter is, at least in part, a core proceeding under 28 U.S.C. § 157(b), in which the United States Bankruptcy Courts may enter final orders and judgment, because, among other things, it involves "matters concerning the administration of the estate" and because it affects "the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship."  *See* 28 U.S.C. § 157(b)(2)(A) and

(O).  To the extent, if any, that this matter is not a core proceeding, Debtor consents to the entry

of final orders or judgment by the bankruptcy judge.

Respectfully Submitted,

SCHAFER AND WEINER, PLLC

By: _____

MICHAEL E. BAUM (P29446)
MICHAEL R. WERNETTE (P55659)
Attorneys for the Debtor
40950 Woodward, Suite 100
Bloomfield Hills, MI  48304
(248) 540-3340

Dated:  January 27, 2005

1/20/05 2:42PM

CASE ASSIGNED
TO JUDGE McIVOR

### United States Bankruptcy Court
#### Eastern District of Michigan

**05-41998**

In re    **Computer Methods Corporation**

_____
                                    Debtor

Case No. _____

Chapter _____ 11

## BANKRUPTCY PETITION COVER SHEET

(To be filed by the debtor with the petition in *every* bankruptcy case. Instead of filling in the boxes on the petition requiring information on prior and pending cases, the debtor may refer to this form.)

### Part 1

"Companion cases," as defined in L.B.R. 1071-1(c), are cases involving any of the following: (1) The same debtor; (2) A corporation and any majority shareholder thereof; (3) Affiliated corporations; (4) A partnership and any of its general partners; (5) An individual and his or her general partner; (6) An individual and his or her spouse; or (7) Individuals or entities with any substantial identity of financial interest or assets.

Has a "companion case" to this case ever been filed at any time in this district or any other district?  Yes___  No_X_

(If yes, complete Part 2.)

### Part 2

For each companion case, state in chronological order of cases: (Attach supplemental sheets if necessary.)

|  | First Case | Second Case | Third Case |
|---|---|---|---|
| Name on petition | | | |
| Relationship to this case | | | |
| Case number | | | |
| Chapter | | | |
| Date filed | | | |
| District | | | |
| Division | | | |
| Judge | | | |
| Status/Disposition | | | |

(Pending, confirmed & still open, confirmed & closed, dismissed before/after confirmation, discharged, etc.)

If the present case is a Chapter 13 case, state for each companion case:
Attorney          _____    _____    _____
Legal fee          $_____   $_____    $_____
Proposed legal fee in this case   $_____
Changes in circumstances which lead the debtor to reasonably believe that the current plan will be successful.

I declare under penalty of perjury that I have read this form and that it is true and correct to the best of my information and belief.

_____          _____          *(signature)*
Debtor                                    Debtor                        Debtor's Attorney
**Gregory P. Guidice**                                              **Michael E. Baum (P29446)**
Date:   1/24/05                                                    **Schafer and Weiner, PLLC**
                                                                   **40950 Woodward Avenue**
                                                                   **Suite 100**
                                                                   **Bloomfield Hills, MI 48304**
                                                                   **(248) 540-3340**

FILED (I)   U.S. BANKRUPTCY COURT   2005 JAN 24 P 12:45

EXHIBIT ___A___

05-41998   1/20/05 2:42PM

(Form 1) (12/03)

FORM B1

# United States Bankruptcy Court
## Eastern District of Michigan

## Voluntary Petition

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Computer Methods Corporation** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No. / Complete EIN or other Tax I.D. No.<br>(if more than one, state all):<br>38-2159731 | Last four digits of Soc. Sec. No. / Complete EIN or other Tax I.D. No.<br>(if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>**13740 Merriman**<br>**Livonia, MI 48150-1814** | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business:    **Wayne** | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |

| Location of Principal Assets of Business Debtor<br>(if different from street address above): |
|---|

## Information Regarding the Debtor (Check the Applicable Boxes)

**Venue** (Check any applicable box)
- ☐ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| Type of Debtor (Check all boxes that apply) | | Chapter or Section of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) | | |
|---|---|---|---|---|
| ☐ Individual(s) | ☐ Railroad | ☐ Chapter 7 | ■ Chapter 11 | ☐ Chapter 13 |
| ■ Corporation | ☐ Stockbroker | ☐ Chapter 9 | ☐ Chapter 12 | |
| ☐ Partnership | ☐ Commodity Broker | ☐ Sec. 304 - Case ancillary to foreign proceeding | | |
| ☐ Other_____ | ☐ Clearing Bank | | | |

**Nature of Debts** (Check one box)
- ☐ Consumer/Non-Business
- ■ Business

**Chapter 11 Small Business** (Check all boxes that apply)
- ☐ Debtor is a small business as defined in 11 U.S.C. § 101
- ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional)

**Filing Fee** (Check one box)
- ■ Full Filing Fee attached
- ☐ Filing Fee to be paid in installments (Applicable to individuals only.) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3.

**Statistical/Administrative Information** (Estimates only)
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

JAN 24 P 12:45    FILED (1)

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Assets | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Debts | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ■ | ☐ | ☐ |

CASE ASSIGNED
TO JUDGE McIVOR

(12/03)                                                                                          FORM B1, Page 2

**ary Petition**

*s page must be completed and filed in every case)*

| Name of Debtor(s): |
| **Computer Methods Corporation** |

| **Prior Bankruptcy Case Filed Within Last 6 Years** (If more than one, attach additional sheet) | Case Number: | Date Filed: |
|---|---|---|
| Location<br>Where Filed:  **- None -** | | |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor:<br>**- None -** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
  Signature of Debtor

X _____
  Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

_____
Date

X _____
  Signature of Attorney
  Signature of Attorney for Debtor(s)
  **Michael E. Baum  (P29446)**
  Printed Name of Attorney for Debtor(s)
  **Schafer and Weiner, PLLC**
  Firm Name
  **40950 Woodward Avenue**
  **Suite 100**
  **Bloomfield Hills, MI 48304**
  Address
  **(248) 540-3340  Fax: (248) 642-2127**
  Telephone Number

_____
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.
The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
  Signature of Authorized Individual
  **Gregory P. Guidice**
  Printed Name of Authorized Individual
  **CEO**
  Title of Authorized Individual
  1/24/05
  Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____
  Signature of Attorney for Debtor(s)          Date

### Exhibit C

Does the debtor own or have possession of any property that poses a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.
■ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number (Required by 11 U.S.C. § 110(c).)

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
  Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156.



STATE OF MICHIGAN
THIRD CIRCUIT COURT

**CASE NO.**



## SUMMONS AND RETURN OF SERVICE

COURT
ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226

COURT
TELEPHONE NO. (313) 224- 5243

THIS CASE ASSIGNED TO JUDGE: SUSAN D BORMAN          Bar Number: 11016

| PLAINTIFF | DEFENDANT |
|---|---|
| SCHRAMM JOHN          PL 01   VS   COMPUTER METHODS CORP          DF 007 | |

**PLAINTIFF'S ATTORNEY**

CHARLES E. KOVSKY
(P-25423)
31077 SCHOOLCRAFT RD
LIVONIA, MI  48150-2029
734-522-2120

| CASE FILING FEE | JURY FEE |
|---|---|
| PAID | NO JURY DEMAND FILED |

| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK |
|---|---|---|
| 12/07/04 | 03/08/05 | PAMELA OLIVER |

*This summons is invalid unless served on or before its expiration date.

Cathy M. Garrett – Wayne County Clerk

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| 03329040 | Borman | |

The action  ☐ remains  ☐ is no longer  pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

Date: _____          Signature of attorney/plaintiff _____

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**

If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)      MC 01 (10/97)      **SUMMONS AND RETURN OF SERVICE**          MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)



*COMPUTER METHODS*

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JOHN SCHRAMM, ROBERT PETERSEN,
JAMES TOLONEN, CATHERINE STEWART,
DAVID BOSMAN, and CHARLES KOVSKY,
      Plaintiffs

vs

COMPUTER METHODS CORP., a Michigan
Corporation, SILVERCUBE HOLDINGS, LLC,
a Michigan limited liability company, and
GREGORY GUIDICE,
      Defendants

Case No.:  04-_____ CB
Hon. Susan D. Borman

_____/

CHARLES E. KOVSKY, P.C.
By: Charles E. Kovsky, Esq. (P25493)
Attorney for Plaintiffs
31077 Schoolcraft Rd.
Livonia, MI 48150
(734) 522-2120, ext 1126

_____/

## COMPLAINT

    *There is now on file in this Court a civil action between these Parties arising out of the same transaction or occurrence as alleged in this Complaint. The action is pending and is No. 03-329040 CK. The action was assigned to the Hon. Susan D. Borman.*

    NOW COME Plaintiffs, by and through their attorney, Charles E. Kovsky, P.C., Complaining against Defendants and allege as follows:

1.    Plaintiff John Schramm is a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan; Plaintiff Robert Petersen is a resident of the City of Livonia, County of Wayne, State of Michigan; Plaintiff James Tolonen is a resident of the City of Troy, County of Oakland, State of Michigan; Plaintiff Catherine Stewart is a resident of the City of Sterling Heights, County of Macomb, State of Michigan; David Bosman is a resident of the State of Iowa; and Plaintiff Charles Kovsky is a resident of the City of Livonia, County of Wayne, State of Michigan.

2.     Defendant Computer Methods Corp. ("CMC") is a Michigan corporation having its principal place of business and registered office in the City of Livonia, County of Wayne, State of Michigan.

3.     Defendant Silvercube Holding, LLC ("Silvercube") is a Michigan liability company established in the Township of Oakland, County of Oakland, State of Michigan.

4.     Defendant Guidice is a resident of the Township of Oakland, County of Oakland, State of Michigan.

5.     Defendant CMC is organized as a for profit corporation having one class of common stock with each share of common stock entitled to one vote.

6.     Currently, and during the whole time complained of herein, all Plaintiffs are, and were, shareholders in Defendant CMC, collectively owning 12.3% of stock in CMC; and there are an additional 6 shareholders, owning an additional 7.7% of stock in CMC who would be benefited by the relief sought in this case.

7.     Defendant Guidice is the owner of 100% of the membership interest in Defendant Silvercube, which in turn is the owner of 80% of the outstanding stock of CMC.  Thus, Defendant Guidice, through his sole ownership of Silvercube, is able to control CMC.

8.     In addition, Defendant Guidice is a director and the chief executive officer of CMC and thus is also able to control the day to day operations of the company through those roles.

9.     As the person in control of CMC, Defendant Guidice has a fiduciary duty to Plaintiffs, as the minority shareholders of CMC.

10.    Defendant CMC has very little in the way of hard assets, since it is a service company providing computer programming services to other businesses.  The overwhelming part of its asserts consists of the ongoing contracts and purchase orders with customers.  Consequently, the assets of CMC basically consist of the income stream one could rely upon resulting from the performance of services for hire.

2

11.     CMC is currently an insolvent corporation since the sum of its debts are greater than all of its assets at a fair valuation, and it cannot generally pay its debts as they become due.

12.     CMC is in need of a restructuring of its debt and an infusion of operating capital in order to remain in business.  If such action is not taken very soon, the company will have to cease operations, to the loss and detriment of the shareholders.

13.     Defendant Guidice has made it clear that through his control of CMC, he intends to compel CMC to sell substantially all of the assets of CMC to an entity called Xever, although such sale would not be in the best interest of all shareholders.  Consequently, it would be futile to make demand upon CMC to take suitable action against the said sale.  A copy of the proposed sales agreement with Xever and the information about the sale provided to Plaintiffs is attached as Exhibit A.

14.     In another action pending before this Court, arising out of the same transaction or occurrence, Defendant Guidice has taken the position that under no circumstances would he consider, on behalf of CMC, the pending alternative offer made by Andrew K. Stewart, the former controlling shareholder of CMC and one of its largest creditors.  A copy of the Stewart offer is attached hereto as Exhibit B.

15.     Under the proposed sale to Xever, Defendants imply that there is an agreement with another large creditor, Shane Group Capital, which is not true.  To the contrary, the Shane Group has determined that the Stewart offer is in their best interest as a creditor and it would be willing to accept his offer in settlement of their $1 million plus claim.  As evidence of its position, in another action pending before this Court, arising out of the same transaction or occurrence, the Shane Group joined in a motion for injunctive relief restraining CMC from selling its assets to Xever, which relief was granted.  The Stewart settlement with the Shane Group would inure to the benefit of all shareholders.

16.     The proposed sale to Xever only requires Xever to assume a nominal amount of the liabilities of CMC, only pays a nominal amount down for the contracts and business opportunities being sold with a nominal promissory note for the balance of the down payment, and merely promises to pay 2% of revenue generated from the business activities sold by CMC for a period of ten years.  These terms are insufficient to protect the interests of CMC and hence those of Plaintiffs.

17.     Defendant Silvercube, as the nominal shareholder of the CMC stock, receives compensation as a result of the transaction, whereas no other shareholder does.  Since Defendant Guidice is the sole owner of Silvercube, he will personally benefit from the payments to Silvercube.  More specifically Silvercube receives 2% of the revenue generated from the business activities sold by CMC for a period of two years.

18.     There are no enforceable provisions in the proposed sale to Xever whereby Xever is required to make operating capital available to CMC.  These omissions are detrimental to the interests of CMC and hence those of Plaintiffs.

19.     There are no enforceable provisions in the proposed sale to Xever whereby Xever is required to subcontract to CMC or to lease employees from CMC.  These omissions are detrimental to the interests of CMC and hence those of Plaintiffs.

20.     If the proposed sale were allowed to take place it would amount to a fraudulent transfer, in violation of *MCL* §566.31 *et seq.*, for the following reasons:

A.     It is made with the actual intent to hinder, delay, or defraud the creditors of CMC.  Defendants have made a decision to avoid paying at least two large creditors of CMC, namely Andrew Stewart and the Shane Group.  Based on the debt service required by CMC to meet its obligations, and the fact that the proposed sale transfers approximately 80% of the revenue from CMC to Xever, it will be impossible for what is left of CMC ever to pay its creditors, especially Andrew Stewart and the Shane Group, who will eventually force CMC out of business.  Once the remnant of CMC is out of business, the interest of the shareholder Plaintiffs is terminated.  Their interests do not, unlike Defendant Guidice, follow into Xever.

B.     CMC does not receive a reasonably equivalent value (which by statutory definition, must exclude in the determination of value the unperformed promises of future

4

revenue) for the assets transferred and would be engaged in business for which the remaining assets of CMC were unreasonably small in relation to the business necessary for the continued viability of the company.

21.     The offer made by Stewart benefits all shareholders, creditors (in particular Fifth Third Bank, Shane Group, and Stewart himself, the three largest), and employees.  It eliminate the liability of the management team under their personal guarantees to the Shane Group, preserves the vested (albeit frozen) ESOP funds for the employees, and provides an opportunity for the shareholders to participate in the success of CMC.  It also pays a fair amount for Mr. Guidice's stock interest ($100,000 for an investment of $100).  Additionally, Mr. Stewart offered to indemnify Mr. Guidice against attorney fees incurred, up to the amount of $50,000, if he were sued as a result of the Stewart proposal being accepted.  He further offered to pay up to $65,000 for past due attorney fees owed by CMC, and for necessary attorney fees to be incurred to complete the sale to Stewart.

22.     By attempting to commit a fraudulent transfer and by ignoring the interests of the minority shareholders, Defendants have committed acts which are fraudulent and willfully unfair and oppressive to the corporation and to the shareholder Plaintiffs, in violation of *MCL* §450.1489.

23.     In furtherance of their plan to deny the rights and benefits of the creditors and the minority shareholders, Defendants are attempting to eliminate the existing injunction in the pending case of *Alliance Holdings, Inc. et al  vs  Stewart et al*, Case number 03-329040  CK, which injunction restrains CMC from selling its assets to Xever.  Once that injunction is dissolved, Defendants intend to follow through with the proposed sale to Xever, which would result in the fraudulent and willfully unfair and oppressive conduct as aforesaid.  Plaintiffs, therefore, are in need of an injunction in this case to restrain Defendants from selling any assets of CMC, until the further Order of the Court.

24.     Because CMC is insolvent and cannot continue to operate for very long in its present status, and because Defendants refuse to operate the company in a manner calculated to preserve the business of CMC for the benefit of all creditors and all shareholders, a receiver is needed to be

appointed to oversee the present operations of CMC and to conduct a sale of its business to the best offeror.

WHEREFORE, Plaintiffs pray as follows:

A.    for a preliminary injunction restraining Defendants from selling any assets except in the ordinary course of business.

B.    for the appointment of a receiver to oversee the present operations of CMC and to conduct a sale of its business to the best offeror.

C.    for whatever monetary damages Plaintiffs are found to be entitled.

D.    for such other and further relief as Plaintiffs may be found to be entitled.

Plaintiffs will ever pray.

Dated: December 7, 2004

CHARLES E. KOVSKY, P.C.

By: _____
Charles E. Kovsky, Esq. (P25493)
Attorney for Plaintiffs
31077 Schoolcraft Rd.
Livonia, MI 48150
(734) 522-2120, ext 1126

6

# EXHIBIT A

Dear Computer Methods Corp. Shareholder:

As set forth in the attached notice, a Special Meeting of the Shareholders of Computer Methods Corp. ("CMC") will be held at Wyndgate Golf Club, 1975 Gunn Road, Rochester, MI. on Monday, November 29, 2004 at 9:00 a.m. local time.

At the Special Meeting, you will be asked to consider and vote upon the sale of certain of CMC's assets consisting of CMC's information technology consulting services business ("IT Business"), including without limitation, T&M, software quality assurance, and Mercury training (the "IT assets"), to Xever, LLC, a Michigan limited liability company (the "Purchaser").

The decision to sell the IT assets is one we feel we must make. Despite many efforts over the past couple of years to maintain and expand CMC's T&M and Mercury training business, the market depression our small size and lack of financial strength has prevented us from obtaining adequate levels of equity financing and has made it difficult to service our existing debt. The sale of the IT assets will mean that CMC will continue the operation of its remaining Fixed Price Contracting (including Ford Europe), Contract Services (Kmart, etc.), and its Digital Forensics business operations. The Corporation will have access to capital raised by Xever LLC in addition to income from the sold IT assets through the royalty payments we expect to receive from Xever's operation of the IT business over the next ten years.

Details of the transaction are set forth in the attached Asset Acquisition Agreement ("Agreement").

SilverCube Holdings, LLC, which is the holder of 80% of outstanding shares, has agreed with Xever to vote its shares in favor of the Transaction. If SilverCube votes its shares as it has agreed to do, there will be a sufficient number of votes to approve the Transaction, even if all other shareholders vote against it.

Under Michigan corporate law, you are being given dissenters' rights, the details of which are set forth in a separate notice included in this mailing. To assist in evaluating this decision, we are also enclosing our financial statements for the year ended December 31, 2003 and year- to-date ending September, 2004. We will also be happy to provide further information and to respond to any questions at the Special Meeting.

**DUE TO THE EXISTENCE OF A CONFLICT OF INTEREST ON THE PART OF GREGORY GUIDICE, THE BOARD OF DIRECTORS OF THE CORPORATION IS NOT MAKING A RECOMMENDATION CONCERNING THIS PROPOSED TRANSACTION.**

Sincerely,

Gregory P. Guidice
CEO

# COMPUTER METHODS CORP.
## NOTICE OF
## SPECIAL MEETING OF SHAREHOLDERS
### To be held November 29, 2004

**TO THE SHAREHOLDERS OF COMPUTER METHODS CORP.:**

Notice is hereby given that a Special Meeting of the Shareholders of COMPUTER METHODS CORP., a Michigan corporation, will be held at the Wyndgate Golf Club, 1975 Gunn Road, Rochester, Michigan, on Monday, November 29, 2004 at 9:00 a.m. local time, for the following purposes:

1. To consider and vote upon a proposed transaction under which CMC would sell certain of CMC's assets consisting of CMC's information technology consulting services business ("IT business" ), including without limitation, T&M, software quality assurance, and Mercury training (the "IT assets"), to Xever, LLC, a Michigan limited liability company ( "Xever"), and

2. To take action upon any other business that may properly come before the meeting, or any adjournment thereof.

Only shareholders of record as shown on the books of COMPUTER METHODS CORP., at the close of business on October 31, 2004 will be entitled to vote at the Special Meeting or any adjournment thereof.

COMPUTER METHODS CORP.
13740 Merriman Road
Livonia, MI 48150-1814

_Shelly L Smith_
_____
Shelly Smith

Secretary

Dated: November 15, 2004

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ADDITIONAL NOTICE

Pursuant to the Michigan Business Corporation Act Sections 761 through 774, each shareholder is being given the right to dissent from this transaction and obtain payment for shares based on their "fair value" as determined pursuant to such statutory law.  Enclosed with this Information Statement is a copy of such Sections 761 through 772 along with a description of the procedure to be followed if a shareholder desires to assert such dissenters' rights.

1

# COMPUTER METHODS CORP.
## A Michigan Corporation

## INFORMATION STATEMENT

### Special Meeting of Shareholders to be held November 29, 2004

This Information Statement is being furnished to shareholders of COMPUTER METHODS CORP., a Michigan corporation, (hereinafter "CMC") by order of its Board of Directors in connection with the Special Meeting of Shareholders to be held on Monday, November 29, 2004 at 9:00 a.m. local time, and any adjournments thereof. This Special Meeting of Shareholders will be held at Wyndgate Golf Club, 1975 Gunn Road, Rochester, MI.

This Special Meeting is being held to consider and vote upon

1.  A proposed transaction involving the sale of certain of CMC's assets consisting of its information technology consulting services business ("IT Business"), including without limitation, T&M, software quality assurance, and Mercury training (the "IT assets"), to Xever LLC pursuant to an Asset Purchase Agreement dated November 9, 2004 and Letter of Intent, and

2.  Any other matters properly presented for consideration at the Special Meeting. Management is unaware of any other matters to be presented at the meeting.

Copies of the Asset Purchase Agreement and related documents are enclosed with this Information Statement for review by shareholders.

Shareholders of record of CMC as of the close of business on October 31, 2004 (the "Record Date") will be entitled to notice of and the right to vote at this Special Meeting. At the Record Date, there were 162,500 shares of Common Stock of CMC outstanding.

### WE ARE NOT ASKING YOU FOR A PROXY AND YOU ARE REQUESTED NOT TO SEND US A PROXY

2

## VOTING INFORMATION

CMC's authorized capitalization consists of 162,500 shares of Common Stock, of which, as of the Record Date, 162,500 shares were issued and outstanding. All outstanding shares of Common Stock as of the Record Date are entitled to one vote for each share on all matters properly coming before the Special Meeting. Votes may be cast in person or by proxy. The presence in person or by proxy of shareholders owning a majority of the outstanding shares of CMC is necessary to constitute a quorum for this meeting. A list of shareholders entitled to vote at the meeting will be available for inspection during the time of the meeting.

The purposes of this Special Meeting are:

1.     To consider and vote on a proposal to approve the transaction ("Transaction") pursuant to which CMC would sell to Xever certain of CMC's assets consisting of CMC's information technology consulting services business ("IT Business"), including without limitation, T&M, software quality assurance, and Mercury training (the "IT assets") pursuant to the Asset Purchase Agreement dated November 9, 2004 and Letter of Intent between CMC and Xever, LLC, a Michigan limited liability company, and.

2.     To take action upon any other business that may properly come before the meeting, or any adjournment thereof. CMC is unaware of any such other business.

Approval of the Transaction requires the affirmative vote of a majority of CMC's outstanding shares. CMC has been advised that SilverCube Holdings, LLC, a limited liability company owned by Greg Guidice, CMC's CEO, which holds shares representing 80% of CMC's total outstanding shares as of the Record Date, has agreed with Xever to vote its shares in favor of the Transaction. If SilverCube Holdings votes its shares as it has agreed to do, there will be a sufficient number of votes to approve the Transaction, even if all other shareholders vote against it.

**DUE TO THE EXISTENCE OF A CONFLICT OF INTEREST ON THE PART OF GREGORY GUIDICE, THE BOARD OF DIRECTORS OF CMC IS NOT MAKING A RECOMMENDATION CONCERNING THIS PROPOSED TRANSACTION.**

Additional information about the Transaction and related matters appears below under the heading "Summary of Transaction."

# PROPOSAL 1

## APPROVAL OF TRANSACTION WITH XEVER, LLC

### SUMMARY OF TRANSACTION

**Background**

CMC provides information technology services to corporate business clients.

CMC is under pressure to satisfy certain debt obligations and right size itself to what it believes is its best opportunity to survive and earn future profits for its Employees, Creditors and Shareholders. CMC also recognizes that it needs to focus its service offering in order to be competitive and sustain its business and to reduce its obligations.

Xever's business mission is to extend the use, function and life of its customers "Legacy" computer assets. Xever believes based on representations made by CMC that the purchase of certain CMC assets, customers and employees would add value to its business.

In November 2004, Xever made a proposal to acquire certain IT assets. Following discussions and negotiations, CMC agreed to accept Xever's offer subject to shareholder approval. A competing offer, made by Mr. Andrew Stewart to Mr. Guidice, was also discussed by the Board of Directors. After careful review of both offers Mr. Guidice, on behalf of SilverCube Holdings, LLC, stated that SilverCube was committed to voting in favor of the Transaction and that it did not find sufficient opportunity and merit in the Stewart proposal to warrant withholding its vote for Xever. Since SilverCube owns 80% of CMC's outstanding Common Stock, it is in a position to decide whether CMC should proceed with the Transaction or consider any alternatives.

Under the terms of the Transaction, Xever is agreeing to pay to CMC for the assets:

- $1,000 at time of closing,

- a $10,000.00 promissory note payable over 24 months with interest of 2% starting January 1, 2005,

- $500,000 in debt financing to pay certain liabilities (terms of which are still being negotiated), and

- a "Royalty" which is equal to 2% of the revenue generated from the sales of services to the Customers transferred to Xever pursuant to the Asset Purchase Agreement for a period of 10 years starting January 1, 2005.

4

CMC further agrees not to interfere with Xever purchased customers, assets or employees without the expressed written approval of Xever.

As a result of the Transaction, CMC is expected to realize the following benefits:

- Access to debt and/or equity capital raised by Xever
- A restructuring of CMC's debt with Fifth Third Bank and Shane Group in a manner that enables all parties to benefit by the growth of CMC and Xever
- The expected elimination of the lawsuit with Shane Group and Mr. Andrew Stewart
- The reasonable prospect of a future stream of revenue from the Royalty payments to be made by Xever without the corresponding expense of operating the IT Business
- A reduction of CMC's operating expenses

Concurrently with the Transaction, CMC's majority shareholder, SilverCube Holdings, LLC, which is owned 100% by Greg Guidice, a Director and CEO of CMC, are entering into certain agreements relating to SilverCube's ownership of a portion of Xever and the payment of certain amounts by Xever to SilverCube. Also, CMC is expected to acquire from Fifth Third Bank the debt it owes to the bank as well as the debt and personal guarantees owed to the Shane Group. Further details concerning these transitions are found below under the heading "Related Party Transactions." Notwithstanding the above perceived benefits from the Transaction, as a result of the conflicts of interest on the part of Greg Guidice, one of our Directors, the Board of Directors is not making a recommendation concerning the Transaction.

## DESCRIPTION OF XEVER, LLC

Xever, LLC is a recently organized Michigan limited liability company that is owned 75% by InterAct Technologies, LLC and 25% by SilverCube Holdings, LLC. InterAct Technologies, LLC is owned by Peter Gruits, Bill Gruits and Dan Furhman and SilverCube Holdings, LLC is owned 100% by Greg Guidice, CEO of CMC. For a further description of the transactions relating to Xever, InterAct and SilverCube, see "Summary of Transaction - Related Party Transactions" below.

Recent economic conditions have driven down the market value of companies in the Information Technology industry. Many businesses in the IT industry have experienced reduced sales and margins forcing them to take on just about any type of project in order to survive.

IT companies that can focus their core business, retain customers and experienced employees will benefit from reduced competition and deferred demand. Xever management believes the timing for acquiring out of focus IT companies is just about right. Xever, LLC was recently formed in order to build a business platform that can take advantage of these acquisition opportunities.

Xever's business mission is to extend the Use, Function, Performance and Life of its customers Legacy Computer Assets. To build a team of qualified, certified and inspired IT professionals that will add value to everything they do.

5

To accomplish its mission Xever will need to develop and perfect meaningful products and services that can be Xever branded, premium valued and simplified in concept and delivery. Xever believes that its success will be based on focusing its resources and talents on products and services that provide its customers with valuable delivered results.

Xever's strategy for growth and profitability includes acquiring customers whose use of IT is critical to the operation of their business. Maintaining, protecting and extending the useable life and function of "Legacy" systems, represents ongoing business grade opportunities as well as the opportunity for new products and service.

Information Builders™ and Mercury™ tools are best of breed products and services for extending the useable life and performance of Legacy computer systems. Xever is able to expand its role with its contract service customers by its VAR relationship of selling and servicing these performance tools while supporting or providing out-sourcing of the customers Legacy computer systems.

The asset purchase of certain customers and employees of CMC provides Xever with an opportunity to expand its customer base and IT Professional team.

Xever's purchase of CMC's assets for a "Royalty" allows CMC to collect a premium for a portion of its historical business, continue the operation of what it considers to be growth business and provide its creditors some relief along with an opportunity to participate in the assets generation of future cash flow for the next 10 years.

### Xever, LLC Directors

#### Peter Gruits

Mr. Gruits is a Director and CEO of Xever, LLC. His years of experience in owning, managing and growing Information Technology companies uniquely qualify him for his assignment.

Mr. Gruits is the Managing Director of CCE Results, LLC, which is based in Grand Rapids, MI. CCE is an IT consulting firm specializing in asset management, production equipment leasing and re-engineering of manufacturing business processes. Mr. Gruits is a CCE principal and is active in the business.

Mr. Gruits was a partner responsible for business development for Keystone Investments, LLC. Keystone was an Owner and Lessor of commercial real estate and production equipment. The portfolio was developed with public company lessees participating in sale/leaseback transactions. The portfolio was securitized and sold for a profit.

Mr. Gruits was the founder and President of Keystone Computer Corporation. Keystone was a Digital Equipment Corporation "DEC" VAR for over 8 years with sales averaging

$25,000,000 a year. The company specialized in integrating computer equipment with software and services for automotive companies, tier one/two suppliers. The company was sold to NYSE listed Company.

Prior to his career at Keystone he worked for CitiCorp as VP of asset lending, Michigan National Bank, as VP of Commercial Loans and Paine, Webber, Jackson & Curtis as a stockbroker. Mr. Gruits majored in economics and business administration at the University of Detroit and Ferris State University.

### Daniel Fuhrman

Mr. Fuhrman is a Director and CFO for Xever, LLC. His years of business experience in strategic planning, mergers and acquisitions help Xever grow organically and thru acquisition.

Mr. Fuhrman is a Founder and Managing Director of Allegent Capital, LLC. Mr. Fuhrman is also Founder and President of Acquisition & Strategy Advisory Partners, LLC, ("ASAP") an investment banking and consulting Company. Mr. Fuhrman provides strategic and financial advisory services to start-ups, growth companies, and troubled companies in a broad range of industries.

Prior to founding ASAP, Mr. Fuhrman was Vice President of Strategic Planning at MascoTech, Inc., a $2 billion automotive component and diversified industrial products manufacturer. At MascoTech, Mr. Fuhrman completed numerous transactions including acquisitions, joint ventures, technology licensing, and divestitures. In addition, Mr. Fuhrman had operating responsibility for two business units.

Mr. Fuhrman's prior work experience includes extensive business strategy and merger and acquisition consulting at LEK Consulting, Inc. and at Bain & Company. His earlier career experience includes industrial engineering work at General Motors, including Fisher Body Division and Saturn Corporation. Mr. Fuhrman holds a Masters Degree in Business Administration from the Massachusetts Institute of Technology Sloan School of Management. Mr. Fuhrman also holds a B.S. in Industrial Engineering from Wayne State University.

### William Gruits

Mr. Gruits is Director and the Secretary for the board of Directors for Xever, LLC. His years of experience in managing and financing growing business will be of great value to the company as it expands.

Mr. Gruits is a Principal of ALLEGENT CAPITAL, LLC. Mr. Gruits was a founder and Managing Director if FGH Capital, LLC, and also Founder and President of American Funding Group, Inc. ("AFG") a lease financing and investment banking Company.

Mr. Gruits provides lease financing and related financial advisory services to a broad range companies and industries, with particular emphasis on transportation equipment and medical equipment. In addition,

7

Mr. Gruits is a principal investor in a radiology services business located in Arizona. Mr. Gruits has over twenty years of experience in lease financing and leveraged buyouts, with a focus on machine tool industries, transportation industries and medical equipment. Mr. Gruits' prior work experience includes GE Capital, Heller Financial, and Chase Manhattan Bank. Mr. Gruits holds a B.B.A. degree from Western Michigan University.

## CMC's Capitalization

CMC's authorized capitalization consists of 162,500 shares of Common Stock, of which, as of the Record Date, 162,500 shares were issued and outstanding.

## Market for CMC's Common Stock

There is no established market for CMC's Common Stock.

## Transaction Documents

The Asset Purchase Agreement and Promissory Note are attached to this Information Statement for review by CMC shareholders. The respective obligations of CMC and Xever and SilverCube Holdings to consummate this Transaction are subject to the satisfaction of certain conditions, including approval by the requisite shareholder vote of CMC's shareholders as required by statutory law and the approval of Fifth Third Bank and Hennessey Capital Corporation.

## Federal Income Tax Consequences of Transaction

No gain or loss should be recognized by a shareholder upon sale of the Corporation's IT assets.

## PRINCIPAL SHAREHOLDERS AND MANAGEMENT

The officers and directors of CMC are as follows:

| Name | Position |
|------|----------|
| Greg Guidice | Director and Chief Executive Officer |
| Dan Manville | Director and President |
| Shelly Smith | Secretary-Treasurer |

8

**Security Ownership of Management and Principal Shareholders**

Set forth in the following table as of November 24, 2004 is the beneficial ownership of the Common Stock of CMC by (i) each director of CMC; (ii) each executive officer of the CMC; (iii) each person or entity known by CMC to own beneficially more than 5% of CMC's Common Stock; (iv) all executive officers and directors of CMC as a group and (v) other shareholders:

| Name of Shareholder | Shares Owned | Percent of Outstanding Common Shares |
|---|---|---|
| SilverCube Holdings, LLC(1) | 130,000 | 80.0 % |
| Charles Finney | 5,000 | 3.1 % |
| James Tolonen | 5,000 | 3.1 % |
| Charles Kovsky | 5,000 | 3.1 % |
| David Bosman | 5,000 | 3.1 % |
| Joseph McCann | 4,000 | 2.5 % |
| John Schramm | 2,500 | 1.5 % |
| Pete Hirth | 1,500 | 0.9 % |
| Catherine Stewart | 1,500 | 0.9 % |
| Thomas Kullman | 1,000 | 0.6 % |
| Robert Petersen | 1,000 | 0.6 % |
| Cormac Wright | 500 | 0.3 % |
| Ken Peckham | 500 | 0.3 % |
| All Executive Officers and Directors as a Group (2 Persons) | 130,000 | 80.0 % |
| TOTAL | 162,500 | 100.0 % |

(1) A limited liability company owned 100% by Greg Guidice.

**Related Party Transactions**

Concurrently with the consummation of the Transaction and with the formation of Xever, LLC, Xever and SilverCube Holdings, LLC "SilverCube," a Michigan Limited Liability Company which is owned 100% by Greg Guidice, CMC's CEO, are entering into an Operating Agreement of Xever pursuant to which, among other things, SilverCube will own 25% of the outstanding membership interests of Xever. In addition, the Operating Agreement provides that Xever will pay to SilverCube a "Royalty" which is equal to 2% of the revenue generated from the sale of services to the customers obtained from CMC as part of the sale of assets for a period of (2) two years starting January 1, 2005.

9

Concurrently with the consummation of the Transaction, CMC, either directly or through an entity, intends to purchase from Fifth Third Bank the obligations owing to Fifth Third. The terms of such purchase are being negotiated but may be similar in some respects to the terms set forth in the enclosed letter from Fifth Third Bank to Mr. Guidice dated November 8, 2004.  Mr. Guidice is also in negotiations with the Shane Group to have CMC either directly or through an entity purchase from Shane Group the obligations and personal guarantees owing to the Shane Group.  Mr. Guidice also intends to explore termination of the litigation between CMC, Shane Group and Andrew K. Stewart upon the closing of the Transaction.

SilverCube Holdings, LLC has agreed with Xever, LLC, as part of the Asset Purchase Agreement, to vote its shares in favor of the Transaction.

## RIGHTS OF DISSENTING CMC SHAREHOLDERS

SHAREHOLDERS OF CMC HAVE THE RIGHT TO DISSENT FROM THIS TRANSACTION AND ARE ENTITLED TO EXERCISE DISSENTER'S RIGHTS PURSUANT TO PROVISIONS OF THE MICHIGAN BUSINESS CORPORATION ACT. SUCH DISSENT, IF MADE STRICTLY IN CONFORMANCE WITH THE STATUTORY REQUIREMENTS, WILL PERMIT CMC SHAREHOLDERS TO BE PAID THE "FAIR VALUE" OF THEIR COMMON STOCK OWNERSHIP OF CMC.  Under the statute, the term "fair value" means the value of a shareholder's stock immediately prior to the effectiveness of the Transaction.  CMC must notify its shareholders of this dissenting right, which is hereby being accomplished through delivery of this Information Statement to the shareholders of CMC, and including a copy of the statutory text which is appended hereto and constitutes Sections 761 thru 774 of the Michigan Business Corporation Act.

The following discussion is qualified in its entirety by the full text of the actual statute, which is included herewith.  ALL CMC SHAREHOLDERS MUST REALIZE THAT A FAILURE TO COMPLY TIMELY AND PROPERLY WITH THE LEGAL PROCEDURES SET FORTH IN THE STATUTES WILL RESULT IN THE LOSS OF THE SHAREHOLDER'S RIGHT TO DISSENT FROM THIS TRANSACTION UNDER MICHIGAN LAW.  Moreover, shareholders of CMC considering such a dissent should realize that the fair value of their Common Stock as determined under these statutory procedures could be more than, the same as, or less than the value of the securities they will hold after the Transaction is consummated in the event they do not dissent there from.

Shareholders of CMC wishing to exercise dissenters' rights to demand the fair value of their common shares must first file, before the vote of shareholders is taken at the Special Meeting on the Transaction, a written notice of intent to demand the fair value of the shares of CMC owned by them, and, in addition, must not vote in favor of the Transaction.  The demand for fair value must be executed by or for the shareholder of record as such shareholder's name appears on his or her stock certificate, and all joint owners if applicable must execute it.  Beneficial owners who are not record owners, if any, should instruct the record owner to comply with these Michigan statutory requirements if they desire to exercise dissenters' rights.  Written election to exercise

10

such dissenters' rights by CMC shareholders should be mailed to or delivered to CMC at the following address: COMPUTER METHODS CORP., 13740 Merriman Road Livonia, MI 48150-1814. Such written demand should specify the shareholder's name, number of shares owned by such shareholder, and should state that the shareholder is demanding the fair value of his or her shares.

After the closing of the Transaction, CMC will cause to be mailed to each shareholder of CMC who has properly asserted such dissenter's rights a notice that will contain (i) the address to which a demand for payment and CMC stock certificates must be sent in order to receive payment and the date by which they must be received and (ii) a form to be used to certify the date on which the CMC shareholder acquired his or her shares of CMC. To receive the fair value of his or her Common Stock, the dissenting shareholder must demand payment and deposit his or her stock certificates within 30 days after such notice is given. Within seven (7) days after this demand for payment is received from any dissenting shareholder, CMC will cause to be remitted to each such dissenter the fair value of his or her shares of CMC Common Stock along with interest as required by the statute, and such remittance shall be accompanied by certain financial information, a brief description of the method used to determine the fair value of the shares and the amount of interest, and a brief description of procedures to be following to demand supplemental payment. If payment is not remitted within 60 days after receiving shares from a dissenting CMC shareholder, share certificates must be returned to such shareholder.

If a dissenting shareholder believes that the amount remitted by CMC is less than the fair value of his or her shares, plus interest, such dissenting shareholder may give written notice to CMC of his or her own estimate of the fair value, and demand a supplemental payment for the resulting difference. Any demand for such supplemental payment must be made within 30 days after CMC has mailed its original remittance to the dissenting shareholder. Within 60 days after receipt of such demand for supplemental payment, CMC must either pay the amount to the dissenting shareholder or file a court petition to judicially determine the fair value of the shares, and such court determination is then binding on all shareholders of CMC who dissent, wherever located. A dissenting shareholder is entitled to judgment for the amount by which the fair value as determined by the court exceeds the amount, if any, already remitted to the dissenting shareholder.

In the event of the filing of a court action to determine the fair value of CMC shares, the court will determine the costs and expenses and compensation of any appraisers appointed by the court and attorneys fees, and may assess such costs, expenses and fees against CMC, excepting that the court may assess part or all of such costs against a dissenter if the court finds the action of such dissenter in demanding payment was arbitrary, vexatious and not in good faith. The Court may also, in its discretion, award fees and expenses to an attorney for dissenting shareholders out of the amount awarded to the dissenting shareholders, if any.

**DUE TO THE CONFLICTS OF INTEREST OF GREG GUIDICE, A DIRECTOR, THE BOARD OF DIRECTORS MAKES NO RECOMMENDATION REGARDING HOW SHAREHOLDERS SHOULD VOTE ON THE FOLLOWING RESOLUTION:**

RESOLVED, that the transactions described in the Asset Purchase Agreement dated November 9, 2004 between CMC and Xever, LLC and each of the ancillary documents or related agreements, substantially in the form attached as exhibits to or required by the Asset Purchase Agreement, subject to such amendments, additions, deletions, alterations or other changes therein as the CEO or any other officers of CMC may approve (such approval to be conclusively evidenced by the execution and delivery thereof by such officers) be and are hereby authorized, approved, ratified and confirmed in all respects;

RESOLVED, that the CEO is authorized and directed to take all such further actions as are necessary or appropriate in furtherance of the foregoing ;

FURTHER RESOLVED, that any acts of CMC or of any person or persons designated and authorized to act by CMC which acts would have been authorized by the foregoing resolutions except such acts were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as acts in the name and on behalf of CMC.

## OTHER BUSINESS

The Board of Directors knows of no business that will be presented at the Special Meeting other than the Transaction that is described in this Information Statement.

November 15, 2004

COMPUTER METHODS CORP.
By Order of the Board of Directors

Greg Guidice, CEO

12

**Asset Purchase Agreement**
(Attached)

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered into as of November 9, 2004 among Xever, LLC, a Michigan limited liability company ("Purchaser"), Computer Methods Corp., a Michigan corporation ("Seller"), SilverCube Holdings, L.L.C., a Michigan limited liability company ("SilverCube"), and for purposes of Sections 7 and 8 below only, Gregory P. Guidice ("Guidice").

### RECITALS:

A.     Seller is engaged in the business of providing information technology consulting services, including without limitation, IT portfolio management, quality assurance, business application development and integration, and training (the "Business").

B.     SilverCube is the controlling shareholder of Seller.  Guidice is the sole member of SilverCube.

C.     Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, certain of the assets used in the Business, on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

1     PURCHASE AND SALE OF ASSETS

    1.1.     Purchase and Sale of the Assets. Effective as of the date of this Agreement (the "Closing Date"), Seller hereby transfers, sells and assigns to Purchaser, and Purchaser purchases from Seller, the following assets used in connection with the Business (the "Assets"), free and clear of any and all Liens (as defined in Section 3.3) other than Permitted Liens (as defined in Section 3.3):

    (a)     The customer lists and prospects lists described on the attached Schedule 1.1(a) (all such customers and prospects being the "Purchased Customers");

    (b)     [intentionally deleted];

    (c)     The equipment listed on the attached Schedule 1.1(c);

    (d)     The furniture, fixtures and other fixed assets listed on the attached Schedule 1.1(d);

    (e)     Any and all patents, patent applications, trademarks, trademark applications and registrations, trade names, service marks, service names, copyrights, copyright applications and registrations, commercial and technical trade secrets, engineering, production and other designs, drawings, specifications, formulae, technology, computer and electronic data processing programs and software, inventions, processes, know-how, confidential information and other proprietary property rights and interests used in connection with the operation of or related to the Business, including, without limitation, the items set forth on the attached Schedule 1.1(e) (the "Intellectual Property");

(f) The contracts, agreements and purchase orders set forth on the attached Schedule 1.1(f) (the "Assumed Contracts"); and

(g) To the extent assignable, copies of the third party software and computer programs of which Seller is a licensee described on the attached Schedule 1.1(g) (the "Licensed Software").

1.2 Excluded Assets. Any provision of this Agreement to the contrary notwithstanding, no assets of the Seller other than the Assets listed in Section 1.1 above are being sold by Seller to Purchaser, or purchased by Purchaser from Seller, pursuant to this Agreement

1.3 Assumed Liabilities.  In connection with its acquisition of the Assets, subject to the provisions of Section 5.4 below, Purchaser hereby assumes those liabilities arising from and after the Closing Date with respect to the Assumed Contracts (the "Assumed Liabilities"). Other than the Assumed Liabilities, Purchaser is not assuming, shall not assume and shall not be liable for any debts, liabilities or obligations of Seller, regardless of the type or nature of such debts, liabilities and obligations (collectively, the "Excluded Liabilities").  The Excluded Liabilities include, without limitation: (i) any liability or obligation of Seller for any violation of any environmental laws arising from the operation of the Business before the Closing Date; (ii) any liability or obligation relating, in any way, to any action, suit, investigation or proceeding pending or threatened before the Closing Date against Seller, the Business or the Assets, at law or in equity, before any federal, state, municipal or other governmental department, commission, board, agency, court or instrumentality; (iii) any liability or obligation relating, in any way, to the employment by Seller of employees of the Business before the Closing Date, including, without limitation, wages, bonuses, health and welfare benefits, workers compensation benefits and COBRA coverage for employees not employed by Purchaser after the Closing Date; (iv) any liability or obligation relating, in any way, to any employee benefit plans; (v) all written or oral contracts or agreements other than the Assumed Contracts; (vi) any liability or obligation of Seller relating, in any way, to taxes arising in connection with the operation of the Business before the Closing Date; and (vii) any and all brokerage fees payable by Seller in connection with this Agreement and the transactions it contemplates.

2. PURCHASE PRICE

2.1. Purchase Price.  For and in consideration of the Assets, Purchaser:

(a) hereby assumes the Assumed Liabilities;

(b) has delivered $1,000.00 in immediately available funds to Seller, the receipt of which Seller acknowledges;

(c) has executed and delivered to Seller that certain Promissory Note of even date with this Agreement in the original principal amount of $10,000 00 (the "Promissory Note"); and

(d)    will pay Seller a royalty payment (each, a "Royalty Payment") equal to 2.0% of Purchaser's Qualifying Net Sales (as defined below) for each month during the ten-year period beginning on January 1, 2005 and ending on December 31, 2014 (the "Royalty Period"). Each Royalty Payment shall be payable by Purchaser no later than the fifth day following the end of each month during the Royalty Period. Together with each Royalty Payment, Purchaser shall deliver to Seller a schedule setting forth the calculation of such Royalty Payment. Purchaser's "Qualifying Net Sales" for any month means all cash revenues received from the Purchased Customers during such month, net of all returns, discounts and allowances.

For purposes of this Agreement, the term "Purchase Price" means the aggregate consideration paid or to be paid to Seller pursuant to clauses (a) through (d) above, inclusive.

2.2.    Allocation of Purchase Price. On or before November 30, 2004, Purchaser shall designate the manner in which the Purchase Price shall be allocated among the Assets, which designation shall be subject to Seller's approval (not to be unreasonably withheld). Seller and Purchaser shall each report the tax consequences of the transactions contemplated by this Agreement in a manner consistent with such allocation and neither Seller nor Purchaser shall take any position inconsistent with such allocation unless otherwise required by applicable laws.

3    **REPRESENTATIONS AND WARRANTIES CONCERNING SELLER AND THE ASSETS.** Each of Seller and SilverCube, jointly and severally, represents and warrants the following to Purchaser, as of the Closing Date:

3.1.    Good Standing and Authority. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Michigan and in each jurisdiction in which Seller conducts business, except where the failure to be so qualified would not have a material adverse effect on the Assets or the Business. All such jurisdictions are listed on the attached Schedule 3.1. Seller has the corporate power and authority to enter into this Agreement, to enter into any and all documents contemplated in, or executed in connection with, this Agreement (the "Attendant Documents") to which it is a party and to consummate the transactions contemplated in this Agreement. This Agreement and all of the Attendant Documents to which Seller is a party, and the consummation of the transactions contemplated in this Agreement, have been duly authorized and approved by all necessary and proper corporate action on the part of Seller. This Agreement, and all of the Attendant Documents to which Seller is a party, when executed and delivered, will constitute legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms.

3.2.    Non-Violative Agreement. Subject to the required approvals disclosed in the attached Schedule 3.7 and in Section 8.13 below, neither the execution and delivery of this Agreement or the Attendant Documents to which Seller is a party nor the consummation of the transactions contemplated in this Agreement will conflict with, result in the breach or violation of or constitute a default under the terms, conditions or provisions of Seller's Articles of Incorporation, bylaws or any

other agreement or instrument to which Seller is a party, or by which Seller may be bound or to which Seller may be subject.

3.3.   **Liens.**   Except for the Licensed Software and those Assets that are subject to claims of creditors who consents are required and are disclosed on the attached Schedule 3.7, Seller owns and has good, marketable and unencumbered title to, or an unencumbered interest in, each item comprising the Assets, free and clear of any and all title defects, judgments, objections, security interests, liens, charges, liabilities, mortgages, easements, restrictions, reservations, tenancies, agreements or other obligations or encumbrances of any nature whatsoever (collectively, the "Liens") other than those Liens described on the attached Schedule 3.3 (the "Permitted Liens").

3.4   **Assets.**   The Assets constitute all of the assets which are used in connection with the operation of, or related to, the Business, other than the Excluded Assets.

3.5.   **Intellectual Property.**   There is no claim outstanding, and, to the knowledge of Seller and SilverCube, there is no basis for any claim, against Seller or its affiliates that the Intellectual Property or any of its operations, activities, products or publications infringes any patent, trademark, trade name, copyright or other proprietary or intellectual property right of any third party or that Seller is illegally using the trade secrets or property rights of others. Seller has no disputes with or claims against, or any basis for claims against, any third party for infringement by such third party of any Intellectual Property.

3.6.   **Licensed Software.**   Seller has valid licenses for its use of the Licensed Software. A list of all such licenses is set forth on the attached Schedule 1.1(g). Seller has not violated the terms of any such license.

3.7.   **Consents, Approvals and Authorizations.**   Except as set forth on the attached Schedule 3.7 and in Section 8.13 below, Seller has obtained all consents, approvals and authorizations of, has made all designations, declarations and filings with, and has provided all notices to, all governmental authorities, lenders, lessors, creditors and others, that are required on the part of Seller in connection with the valid execution and delivery of this Agreement and the Attendant Documents to which it is a party and the consummation of the transactions contemplated in this Agreement.

3.8.   **Brokerage or Finder's Fee.**   No broker, finder, agent or similar intermediary has acted for or on behalf of Seller or SilverCube in connection with this Agreement or the transactions contemplated hereby and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement, arrangement or understanding with, or any action taken by Seller or SilverCube.

3.9.   **Disclosure.**   No representation or warranty by Seller or SilverCube contained in this Agreement and no statement contained in any of the Attendant Documents to which Seller or SilverCube is a party or any other certificate or instrument furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated in this Agreement contains or will contain any untrue

statement of a material fact, or omits or will omit to state a material fact, necessary in order to make any of the statements not misleading.

4.   REPRESENTATIONS AND WARRANTIES OF PURCHASER   Purchaser represents and warrants the following to Seller, as of the Closing Date:

4.1.   Good Standing and Authority.   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Michigan.   Purchaser has the limited liability company power and authority to enter into this Agreement, to enter into the Attendant Documents to which it is a party and to consummate the transactions contemplated in this Agreement.   This Agreement and all of the Attendant Documents to which Purchaser is a party, and the consummation of the transactions contemplated in this Agreement, have been duly authorized and approved by all necessary and proper limited liability company action on the part of Purchaser.   This Agreement, and all of the Attendant Documents to which Purchaser is a party, when executed and delivered, will constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms.

4.2.   Non-Violative Agreement.   Neither the execution and delivery of this Agreement and the Attendant Documents to which Purchaser is a party nor the consummation of the transactions contemplated in this Agreement will conflict with, result in the breach or violation of or constitute a default under the terms, conditions or provisions of Purchaser's Articles of Organization or operating agreement or any other agreement or instrument to which Purchaser is a party, or by which Purchaser may be bound or to which it may be subject.

4.3.   Brokerage or Finder's Fee   No broker, finder, agent or similar intermediary has acted for or on behalf of Purchaser in connection with this Agreement or the transactions contemplated hereby and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement, arrangement or understanding with Purchaser or any action taken by Purchaser.

5   ADDITIONAL AGREEMENTS.

5.1.   Survival.   The representations and warranties set forth in Sections 3 and 4 of this Agreement shall survive indefinitely.

5.2   Employees.   Purchaser may offer employment on terms and conditions as Purchaser in its sole discretion determines to those employees of Seller that Purchaser desires to employ after the Closing Date. Purchaser may evaluate its employment needs with respect to the Business, and no provision of this Agreement is intended to or shall confer on any such employee any right to continued employment after the Closing Date.   Nothing in this Agreement shall be construed to amend or modify in any way any at-will employment policy of Purchaser.

5.3   Tax Matters.   Seller shall be responsible for the preparation and filing of all tax returns for the Business due either before or after the Closing Date that cover periods ending on or before the Closing Date.   Seller shall make all payments

1027661.11                                    5

required with respect to any such tax returns. Purchaser shall be responsible for the preparation and filing of all tax returns for the Business due after the Closing Date that cover periods ending after the Closing Date. Purchaser will make all payments required with respect to any such tax returns; provided, however, that Seller shall reimburse Purchaser concurrently with the filing of such tax returns to the extent to any payment Purchaser makes relates to the operation of the Business by Seller for any period ending on or before the Closing Date.

5.4.    Assignment of Certain Assets.  To the extent that due to the failure to obtain any consent, approval or authorization listed on Schedule 3.7, Seller's rights under any Assumed Contract or Licensed Software may not be assigned to Purchaser, this Agreement shall not constitute an assignment of such Assumed Contract or Licensed Software if any such attempted assignment would constitute a breach thereof, be unlawful or in any way adversely affect the rights of Purchaser thereunder (as compared with Seller's rights before the Closing Date).  If any attempted assignment would be ineffective or have such other effect as is described in the foregoing sentence, Seller shall (a) take such actions as Purchaser may reasonably request to assist Purchaser in obtaining any such consent, approval or authorization after the Closing Date, (b) to the extent permitted by applicable law, act after the Closing Date as the agent of Purchaser in order to obtain for Purchaser the benefits under such Assumed Contract or Licensed Software, and (c) cooperate with Purchaser in any arrangement that Purchaser may reasonably desire so that Purchaser may obtain the benefits under any such Assumed Contract or Licensed Software, including enforcement of any and all rights against a third party arising out of the breach or cancellation by such third party or otherwise.

6.    INDEMNIFICATION

6.1.    Indemnification of Purchaser Parties.  Seller and SilverCube, jointly and severally, shall indemnify, defend and hold harmless Purchaser and its officers, managers, members, employees, independent contractors, agents, successors and assigns (collectively, the "Purchaser Parties") from and against any and all liabilities, losses, costs or expenses which any of the Purchaser Parties may suffer or for which any of the Purchaser Parties may become liable and which are based on, the result of, arise out of or are otherwise related to any of the following:

(a)    any inaccuracy or misrepresentation in, or breach of any representation or warranty of Seller or SilverCube in this Agreement, any of the Attendant Documents or any certificate, schedule, list or other instrument to be furnished by Seller to Purchaser pursuant to this Agreement or any of the Attendant Documents;

(b)    any breach or failure of Seller or SilverCube to perform any covenant or agreement required to be performed by Seller or SilverCube pursuant to this Agreement or any of the Attendant Documents;

(c)    any claim, demand, suit, action or legal, administrative or other proceeding by any person (other than a party) or any federal, state or local department, agency or other governmental body (a "Third Party Claim") against any of the Purchaser Parties resulting from, arising out of or in any way related to

1027661 11                                              6

(i) the operation of the Business prior to the Closing Date, or (ii) the failure of Seller to perform, pay or discharge any Excluded Liability; and

(d) any and all actions, suits, proceedings, demands, assessments, judgments, costs and expenses, including reasonable attorneys' and consultants' fees (collectively, "Related Expenses"), incident to any of the foregoing.

Guidice shall indemnify, defend and hold harmless the Purchaser Parties from and against any and all liabilities, losses, costs or expenses which any of the Purchaser Parties may suffer or for which any of the Purchaser Parties may become liable and which are based on, the result of, arise out of or are otherwise related to any inaccuracy or misrepresentation in, or breach of any representation or warranty of Guidice in Sections 7.1 or 8.15 of this Agreement, any failure of Guidice to perform any covenant or agreement required to be performed by Guidice pursuant to Sections 7, 8.13 or 8.15 of this Agreement, and any and all Related Expenses incident to any of the foregoing.

6.2. Indemnification of Seller Parties.  Purchaser shall indemnify, defend and hold harmless Seller and its officers, directors, shareholders, employees, independent contractors, agents, successors and assigns (collectively, the "Seller Parties") from and against any and all liabilities, losses, costs or expenses which any of the Seller Parties may suffer or for which any of the Seller Parties may become liable and which are based on, the result of, arise out of or are otherwise related to any of the following:

(a) any inaccuracy or misrepresentation in, or breach of any representation or warranty of Purchaser contained in, this Agreement, any of the Attendant Documents or any certificate, schedule, list or other instrument to be furnished by Purchaser to Seller pursuant to this Agreement or any of the Attendant Documents;

(b) any breach or failure of Purchaser to perform any covenant or agreement required to be performed by Purchaser pursuant to this Agreement or any of the Attendant Documents;

(c) any Third Party Claim against any of the Seller Parties resulting from, arising out of or in any way related to (i) the operation of the Business after the Closing Date, or (ii) the failure of Purchaser to perform, pay or discharge any Assumed Liability; and

(d) any and all Related Expenses incident to any of the foregoing.

6.3. Claims for Indemnification.  Whenever any claim shall arise for indemnification under this Section 6, even if no payment is then due on account thereof, the party seeking indemnification (the "Indemnified Party") shall notify (the "Notice") the party against whom indemnification is sought (the "Indemnifying Party") of the claim  In the event of any Third Party Claim, the Indemnified Party shall provide the Notice within 30 days after the Indemnified Party has actual knowledge of its existence and, when known, the facts constituting the basis for such claim in reasonable detail, but the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability that it may have to the Indemnified

Party, except to the extent that the Indemnifying Party demonstrates that the defense of such Third Party Claim is materially prejudiced by the Indemnified Party's failure to give such Notice. In the event of any Third Party Claim, the Notice shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom. The Indemnified Party shall not settle or compromise any Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed, unless suit shall have been instituted against the Indemnified Party and the Indemnifying Party shall not have taken control of such suit in accordance with Section 6.4 below.

6.4.    Defense by the Indemnifying Party. Within seven days after receipt of the Notice, the Indemnifying Party, at its sole cost and expense, may, upon written notice to the Indemnified Party, assume the defense of any Third Party Claim. If the Indemnifying Party timely assumes the defense of any Third Party Claim, the Indemnifying Party shall select counsel reasonably acceptable to the Indemnified Party to conduct the defense of such Third Party Claim and, at the sole cost and expense of the Indemnifying Party, the Indemnifying Party shall take all steps necessary in the defense or settlement thereof. The Indemnified Party shall be entitled to participate in (but not control) the defense of any Third Party Claim, with its own counsel and at its own expense; provided, however, that if the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party, and the Indemnified Party has been advised by counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the Indemnifying Party, then the Indemnified Party may employ separate counsel at the expense of the Indemnifying Party. The Indemnifying Party shall not consent to a settlement of, or the entry of any judgment arising from, any Third Party Claim without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnifying Party fails to assume and continually maintain the defense of the Third Party Claim within seven days after the Indemnifying Party's receipt of the Notice, the Indemnified Party may assume sole control of defense or settlement of such claim at the sole cost and expense of the Indemnifying Party.

6.5    Certain Limitations on Indemnification.

(a)    Notwithstanding the foregoing, (i) the maximum amount recoverable by the Purchaser Parties from SilverCube for all indemnifiable claims shall not exceed the lesser of (A) $200,000.00, and (B) the amount actually received by SilverCube pursuant to the Operating Agreement of Xever, LLC, dated the same date as this Agreement, as the same may be amended from time-to-time (the "Operating Agreement"), and (ii) no claim for indemnification against SilverCube may be made after the 2nd anniversary of the Closing Date; provided, however, that these limitations shall not apply to claims based on fraud or intentional conduct or any claims based on a breach of Sections 7, 8.13 or 8.14 below.

(b)    In calculating any losses with respect to any claims for indemnification hereunder, there shall be deducted (i) any insurance recovery actually received in respect thereof (less the present value of any increased

premiums directly attributable thereto), and (ii) the amount of any actual tax benefit to the Indemnified Party (or its affiliates) with respect to such loss.

(c) This Section 6 shall be the sole and exclusive remedy in respect of any breach of representation or warranty or failure to perform any agreement or covenant herein.

6.6. <u>Right of Offset.</u>  Any amounts payable by Seller or SilverCube to Purchaser under this Agreement (including, without limitation, pursuant to this Section 6) or any Attendant Document may, at the option of Purchaser, be set off against any amounts payable by Purchaser to Seller, SilverCube or any entity either of them controls under this Agreement or any Attendant Document (including, without limitation, Royalty Payments and payments under the Promissory Note) or otherwise (including, without limitation, pursuant to the Operating Agreement, subject to the limitation set forth in Section 6.5(a) above).

7. <u>NON-SOLICITATION</u>

7.1. <u>Non-Solicitation of Purchased Customers</u>. Each of Seller, SilverCube and Guidice covenants, warrants and agrees, for the benefit of Purchaser and its subsidiaries, successors and assigns (collectively, the "Purchaser Beneficiaries"), that without first obtaining Purchaser's express written consent, which may be granted or withheld in Purchaser's sole discretion, Seller, SilverCube and Guidice shall not, either directly or indirectly:

(a) divert from any of the Purchaser Beneficiaries, or by aid of others, do anything which would tend to divert from any of the Purchaser Beneficiaries, any trade or business with any Purchased Customer;

(b) solicit, induce or attempt to induce any employee or independent contractor of any of the Purchaser Beneficiaries to (i) leave the employment of or terminate his, her or its contractual relationship with such Purchaser Beneficiaries, or (ii) enter into the employ of or a contractual relationship with Seller, SilverCube or Guidice, any entity in which Seller, SilverCube or Guidice has any interest whatsoever, or any competitor of any of the Purchaser Beneficiaries; or

(c) use, publish, disseminate, distribute or otherwise disclose any of Purchaser's Confidential Information (defined below).

7.2. <u>Non-Solicitation of Seller's Customers</u>. Purchaser covenants, warrants and agrees, for the benefit of Seller and its subsidiaries, successors and assigns (collectively, the "Seller Beneficiaries"), that without first obtaining Seller's express written consent, which may be granted or withheld in Seller's sole discretion, Purchaser shall not, either directly or indirectly:

(a) divert from any of the Seller Beneficiaries, or by aid of others, do anything which would tend to divert from any of the Seller Beneficiaries, any trade

or business with any of Seller's customers (other than the Purchased Customers);

(b)    solicit, induce or attempt to induce any employee or independent contractor of any of the Seller Beneficiaries to (i) leave the employment of or terminate his, her or its contractual relationship with such Seller Beneficiaries, or (ii) enter into the employ of or a contractual relationship with Purchaser, any entity in which Purchaser has any interest whatsoever, or any competitor of any of the Seller Beneficiaries; or

(c)    use, publish, disseminate, distribute or otherwise disclose any of Seller's Confidential Information.

7.3.    <u>Confidential Information</u>. "Confidential Information" means any and all confidential or proprietary information, regardless of nature or kind, which in any way is related to or concerns a party or its business (including, without limitation, information relating to its trade secrets, marketing strategies, methods of operation, machinery, equipment, distribution processes, sources of supplies, operating and other cost data, customer lists and customer contacts, agreements and their terms and conditions, and any other information which is not generally known), whether disclosed orally or in writing, and whether learned, acquired or known by the disclosing party prior to or after the date of this Agreement, except that which the disclosing party can demonstrate: (a) prior to the date of this Covenant, was generally publicly available; or (b) after the date of this Agreement, (i) becomes publicly available without fault of or action on the part of the disclosing party, or (ii) is acquired by the disclosing party from a third party, free of any restrictions as to its disclosure.

7.4.    <u>Interpretation</u>. The parties acknowledge and agree that the covenants set forth in this Section 7 are reasonable and valid in temporal scope and in all other respects. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is invalid or unenforceable, the remainder of the covenants set forth in this Section 7 shall not be affected and shall be given full force and effect, without regard to the invalid covenant or the invalid portion. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is unenforceable because of its duration or scope, such court shall have the power to reduce such duration or scope, as the case may be, and to enforce such covenant or portion in such reduced form.

7.5    <u>Remedies</u>. The parties acknowledge that the remedy at law for a breach or threatened breach of any of the covenants set forth in this Section 7 would be inadequate. The parties therefore covenant and agree that in the event of a breach or attempted breach of any of the covenants set forth in this Section 7, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction in an action in equity.

8.    <u>MISCELLANEOUS</u>

8.1.    <u>Expenses</u>. Seller and Purchaser shall each bear the expenses incurred by them in connection with the preparation and negotiation of this Agreement and the

Attendant Documents and the consummation of the transactions contemplated in this Agreement.

8.2    Notices.  Any notice, request, demand or other communication permitted under or required pursuant to this Agreement shall be deemed to have been sufficiently given or made for all purposes only if it is in writing and is: (a) delivered personally to the party to whom it is directed; (b) sent by first class mail or overnight express courier, postage and charges prepaid, addressed to the party to whom it is directed; or (c) faxed to the party to whom it is directed, in each case at its address set forth below or at such other address as it may indicate by written notice given as provided in this Section 8.2:

| If to Seller, SilverCube or Guidice: | With a required copy to: |
|---|---|
| | Butzel Long |
| 13740 Merriman Road | 150 W. Jefferson, Suite 100 |
| Livonia, MI 48150-1814 | Detroit, MI 48226-4450 |
| Attn: Gregory P. Guidice | Attn: Robert A. Hudson |
| Fax: (734) 522-2705 | Fax: (313) 225-7080 |
| If to Purchaser: | With a required copy to: |
| | Jaffe, Raitt, Heuer & Weiss, P.C. |
| 414 East Street, Suite 200 | 27777 Franklin Road, Suite 2500 |
| Rochester, MI 48307 | Southfield, MI 48034 |
| Attn: Daniel D. Fuhrman | Attn: Derek S. Adolf |
| Fax: 248-650-8302 | Fax: 248-351-3082 |

8.3    Headings.  The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

8.4.   Construction.  This Agreement has been executed in, and shall be construed and enforced in accordance with the laws of, the State of Michigan without regard to the conflicts of law principles thereof.

8.5.   No Assignment; Benefit.  No party may assign its rights and obligations under this Agreement without the prior written consent of the other parties; provided, however, that, without the prior written consent of Seller, Purchaser may assign its rights and obligations under this Agreement to (a) an affiliate of Purchaser, or (b) as collateral security to Purchaser's lenders  This Agreement shall be binding on and inure to the benefit of the parties and their respective successors and assigns

8.6.   No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any party other than the parties to this Agreement and their respective successors and permitted assigns.

8.7.   Entire Agreement.  This Agreement, including the Exhibits and the Schedules attached or to be attached to it, is and shall be deemed to be the complete and final expression of the agreement between the parties as to the matters contained in and

Schedule 1.1(f)

Assumed Contracts List

(see attached)

Computer Methods Corporation
Contracts sold to
Xever, LLC

Mercury Gold Partner
379 North Whisman Road
Mountain View,  CA  94043
650-6003-5200

Mercury is a global leader in business technology optimization and automated software
testing solutions including application delivery, application management and IT
governance offerings.

Schedule 1.1(g)

Licensed Software List

(No licensed software was acquired)



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JOHN SCHRAMM, ROBERT PETERSEN,
JAMES TOLONEN, CATHERINE STEWART,
DAVID BOSMAN, and CHARLES KOVSKY,
     Plaintiffs

vs

Case No.: 04-437292 CB
Hon. Susan D. Borman

COMPUTER METHODS CORP., a Michigan
Corporation, SILVERCUBE HOLDINGS, LLC,
a Michigan limited liability company, GREGORY
GUIDICE, XEVER, LLC, a Michigan limited liability
company, and PETER GRUITS,
     Defendants
                                      /

CHARLES E. KOVSKY, P.C.
By: Charles E. Kovsky, Esq. (P25493)
Attorney for Plaintiffs
31077 Schoolcraft Rd.
Livonia, MI 48150
(734) 522-2120, ext 1126
                                      /

## FIRST AMENDED COMPLAINT

*There is now on file in this Court a civil action between these Parties arising out of the same transaction or occurrence as alleged in this Complaint. The action is pending and is No. 03-329040 CK. The action was assigned to the Hon. Susan D. Borman.*

NOW COME Plaintiffs, by and through their attorney, Charles E. Kovsky, P.C., as a matter of right under MCR 2.118(A) hereby amend their Complaint against Defendants and allege as follows:

### COUNT I

1.    Plaintiff John Schramm is a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan; Plaintiff Robert Petersen is a resident of the City of Livonia, County of Wayne, State of Michigan; Plaintiff James Tolonen is a resident of the City of Troy, County of Oakland, State of Michigan; Plaintiff Catherine Stewart is a resident of the City of Sterling Heights, County of Macomb,

State of Michigan; David Bosman is a resident of the State of Iowa; and Plaintiff Charles Kovsky is a resident of the City of Livonia, County of Wayne, State of Michigan.

2.    Defendant Computer Methods Corp. ("CMC") is a Michigan corporation having its principal place of business and registered office in the City of Livonia, County of Wayne, State of Michigan.

3.    Defendant Silvercube Holding, LLC ("Silvercube") is a Michigan liability company established in the Township of Oakland, County of Oakland, State of Michigan.

4.    Defendant Guidice is a resident of the Township of Oakland, County of Oakland, State of Michigan.

5.    Defendant CMC is organized as a for profit corporation having one class of common stock with each share of common stock entitled to one vote.

6.    Defendant Xever, LLC, is a Michigan liability company established in the City of Rochester, County of Oakland, State of Michigan.

7.    Defendant Gruits is a resident of the State of Michigan and is doing business in the County of Wayne, State of Michigan, as a member, Chief Executive Officer, and Director of Xever.

8.    Currently, and during the whole time complained of herein, all Plaintiffs are, and were, shareholders in Defendant CMC, collectively owning 12.3% of stock in CMC; and there are an additional 6 shareholders, owning an additional 7.7% of stock in CMC who would be benefited by the relief sought in this case.

9.    Defendant Guidice is the owner of 100% of the membership interest in Defendant Silvercube, which in turn is the owner of 80% of the outstanding stock of CMC. Thus, Defendant Guidice, through his sole ownership of Silvercube, is able to control CMC.

10.    In addition, Defendant Guidice is a director and the chief executive officer of CMC and thus is also able to control the day to day operations of the company through those roles.

11.    As the person in control of CMC, Defendant Guidice has a fiduciary duty to Plaintiffs, as the minority shareholders of CMC.

2

12.     Defendant CMC has very little in the way of hard assets, since it is a service company providing computer programming services to other businesses.  The overwhelming part of its asserts consists of the ongoing contracts and purchase orders with customers.  Consequently, the assets of CMC basically consist of the income stream one could rely upon resulting from the performance of services for hire.

13.     CMC is currently an insolvent corporation since the sum of its debts are greater than all of its assets at a fair valuation, and it cannot generally pay its debts as they become due.

14.     CMC is in need of a restructuring of its debt and an infusion of operating capital in order to remain in business.  If such action is not taken very soon, the company will have to cease operations, to the loss and detriment of the shareholders.

15.     Defendant Guidice has made it clear that through his control of CMC, he intends to compel CMC to sell substantially all of the assets of CMC to an entity called Xever, although such sale would not be in the best interest of all shareholders.  Consequently, it would be futile to make demand upon CMC to take suitable action against the said sale.  A copy of the proposed sales agreement with Xever and the information about the sale provided to Plaintiffs is attached as Exhibit A.

16.     In another action pending before this Court, arising out of the same transaction or occurrence, Defendant Guidice has taken the position that under no circumstances would he consider, on behalf of CMC, the pending alternative offer made by Andrew K. Stewart, the former controlling shareholder of CMC and one of its largest creditors.  A copy of the Stewart offer is attached hereto as Exhibit B.

17.     Under the proposed sale to Xever, Defendants imply that there is an agreement with another large creditor, Shane Group Capital, which is not true.  To the contrary, the Shane Group has determined that the Stewart offer is in their best interest as a creditor and it would be willing to accept his offer in settlement of their $1 million plus claim.  As evidence of its position, in another action pending before this Court, arising out of the same transaction or occurrence, the Shane Group joined in a motion for injunctive relief restraining CMC from selling its assets to Xever, which relief was granted.  The Stewart settlement with the Shane Group would inure to the benefit of all shareholders.

3

18.    The proposed sale to Xever only requires Xever to assume a nominal amount of the liabilities of CMC, only pays a nominal amount down for the contracts and business opportunities being sold with a nominal promissory note for the balance of the down payment, and merely promises to pay 2% of revenue generated from the business activities sold by CMC for a period of ten years.  These terms are insufficient to protect the interests of CMC and hence those of Plaintiffs.

19.    Defendant Silvercube, as the titleholder of the CMC stock, receives compensation as a result of the transaction, whereas no other shareholder does.  Since Defendant Guidice is the sole owner of Silvercube, he will personally benefit from the payments to Silvercube.  More specifically Silvercube receives 2% of the revenue generated from the business activities sold by CMC for a period of two years.

20.    There are no enforceable provisions in the proposed sale to Xever whereby Xever is required to make operating capital available to CMC.  These omissions are detrimental to the interests of CMC and hence those of Plaintiffs.

21.    There are no enforceable provisions in the proposed sale to Xever whereby Xever is required to subcontract to CMC or to lease employees from CMC.  These omissions are detrimental to the interests of CMC and hence those of Plaintiffs.

22.    If the proposed sale were allowed to take place it would amount to a fraudulent transfer, in violation of *MCL* §566.31 *et seq.*, for the following reasons:

A.    It is made with the actual intent to hinder, delay, or defraud the creditors of CMC. Defendants have made a decision to avoid paying at least two large creditors of CMC, namely Andrew Stewart and the Shane Group.  Based on the debt service required by CMC to meet its obligations, and the fact that the proposed sale transfers approximately 80% of the revenue from CMC to Xever, it will be impossible for what is left of CMC ever to pay its creditors, especially Andrew Stewart and the Shane Group, who will eventually force CMC out of business.  Once the remnant of CMC is out of business, the interest of the shareholder Plaintiffs is terminated.  Their interests do not, unlike Defendant Guidice, follow into Xever.

B.    CMC does not receive a reasonably equivalent value (which by statutory definition, must exclude in the determination of value the unperformed promises of future revenue) for the assets transferred and would be engaged in business for which the remaining assets of

4

CMC were unreasonably small in relation to the business necessary for the continued viability of the company.

23.    The offer made by Stewart benefits all shareholders, creditors (in particular Fifth Third Bank, Shane Group, and Stewart himself, the three largest), and employees.  It eliminate the liability of the management team under their personal guarantees to the Shane Group, preserves the vested (albeit frozen) ESOP funds for the employees, and provides an opportunity for the shareholders to participate in the success of CMC.  It also pays a fair amount for Mr. Guidice's stock interest ($100,000 for an investment of $100).  Additionally, Mr. Stewart offered to indemnify Mr. Guidice against attorney fees incurred, up to the amount of $50,000, if he were sued as a result of the Stewart proposal being accepted.  He further offered to pay up to $65,000 for past due attorney fees owed by CMC, and for necessary attorney fees to be incurred to complete the sale to Stewart.

24.    By attempting to commit a fraudulent transfer and by ignoring the interests of the minority shareholders, Defendants have committed acts which are fraudulent and willfully unfair and oppressive to the corporation and to the shareholder Plaintiffs, in violation of *MCL* §450.1489.

25.    In furtherance of their plan to deny the rights and benefits of the creditors and the minority shareholders, Defendants CMC, Silvercube, and Guidice have violated the existing injunction in the pending case of *Alliance Holdings, Inc. et al  vs  Stewart et al*, Case number 03-329040  CK, which injunction restrains CMC from transferring its assets to Xever, by contacting existing customers of CMC and advising them that the customers are to start issuing purchase orders in the name of Xever.

26.    In furtherance of their plan to deny the rights and benefits of the creditors and the minority shareholders, Defendants CMC, Silvercube, and Guidice have violated the existing injunction in the pending case of *Alliance Holdings, Inc. et al  vs  Stewart et al*, Case number 03-329040  CK, which injunction restrains CMC from transferring its assets to Xever, by directing employees of CMC to contact existing customers of CMC and to advise them that the customers are to start issuing purchase orders in the name of Xever, which is in fact a transfer of the assets of CMC.

5